IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DERRICK BASS, | ) | CASE NO. 1:14-CV-109 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Derrick Bass's ("Plaintiff" or "Bass") applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be REVERSED and REMANDED.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance benefits and Supplemental Security Income benefits on March 11, 2008. (Tr. 156-62).  Bass alleged he became disabled on August 1, 2006. (Tr. 183).  The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 59-62, 66-68).

Bass requested that an administrative law judge ("ALJ") convene a hearing to evaluate his applications. (Tr. 69-70).  An administrative hearing was scheduled for August 5, 2009, but on August 31, 2009, ALJ Paul Murphy dismissed Plaintiff's case after Plaintiff failed to appear at the hearing and to respond to a show cause notice. (Tr. 38-39).  Thereafter, Bass requested review of the ALJ's dismissal by the Appeals Council. (Tr. 81).  The council remanded the claim and directed the ALJ to provide Bass with an opportunity for a second hearing. (Tr. 41-42).

On September 29, 2010, a hearing was held before ALJ Murphy. (Tr. 54).  On February 22, 2011, ALJ Murphy found Plaintiff was not disabled. (Tr. 46-53).  Subsequently, the Appeals Council granted Bass's request for review of the ALJ's decision on the grounds that it had received new evidence from Bass's treating psychiatrist, the transcript of the hearing from before ALJ Murphy could not be located, and further consideration and development was required to determine if Bass had past relevant work. (Tr. 56-58).

On December 18, 2012, a hearing was held before ALJ Melissa Warner. (Tr. 420-53).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*).  A vocational expert ("VE"), Mr. McFee, also appeared and testified. (*Id.*).  On February 22, 2013, the ALJ issued a decision finding Plaintiff was not disabled. (Tr. 19-33).  After applying the five-step sequential analysis,[1] the ALJ determined Bass retained the ability to perform work existing in

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)    If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)    If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve

significant numbers in the national economy. (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 15).  The Appeals Council denied his request for review, making the ALJ's February 22, 2013, determination the final decision of the Commissioner. (Tr. 6-8).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II. EVIDENCE

### A.  Personal and Vocational Evidence

Bass was born on September 3, 1964, and was 49-years-old on the date the ALJ rendered her decision. (Tr. 156).  Accordingly, Plaintiff was considered a "younger person" for Social Security purposes. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  Plaintiff completed high school and has past relevant work as a cemetery worker, a furniture stainer, a mold machine operator, an automotive glass installer, and a stores laborer. (Tr. 31-32, 428, 446-47).

### B.  Medical Evidence[2]

#### 1.  Physical Impairments

On July 27, 2007, Plaintiff underwent a consultative physical examination with Sushil Sethi, M.D. (Tr. 241-47).  Bass complained of what he believed to be arthritis in various parts of

---

months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

his body, particularly his hands. (Tr. 241).  Bass told Dr. Sethi that he did not use a cane or ambulatory aid. (*Id.*). He gave a vague description of what may have been a seizure in May 2005 and stated he had been evaluated for a possible seizure in May 2006. (Tr. 242).  A CT scan of the brain and chest x-rays performed in May 2006 returned clear. (*Id.*).  Aside from mild tenderness around the knee area, Bass's physical examination generally revealed no notable findings. (Tr. 242-47).  Dr. Sethi opined that there were no physical findings to support Plaintiff's arthritic complaints. (Tr. 243).  The doctor concluded that Bass's ability to do work-related physical activities was unimpaired. (*Id.*).

In April 2008, state agency reviewer Brian Baumgartner assessed the medical evidence of record and determined that Plaintiff did not suffer from a severe physical impairment that would limit his ability to work. (Tr. 332). On May 8, 2008, Plaintiff underwent outpatient surgery on his jaw after it was fractured in a fight. (Tr. 262-66).  Other physical findings were normal. (Tr. 264).  During September 2008, state agency reviewer Betty Feusner also opined that Bass had no severe physical impairments. (Tr. 334).

On December 1, 2012, Frank Abbati, M.D. completed a Multiple Impairment Questionnaire. (Tr. 373-80).  Dr. Abbati's specialty was cardiology. (Tr. 380).  He explained that he began treating Bass in July 2012 and saw Bass every six weeks. (Tr. 373).  Plaintiff's diagnoses were uncontrolled diabetes, polyneuropathy, chronic obstructive pulmonary disease ("COPD"), chronic alcoholism, and a forehead rash. (*Id.*).  The doctor wrote that an electromyography ("EMG"), Hemoglobin A1c ("HBA1C"), a lipids profile, chemical profile, and complete blood count ("CBC") supported these diagnoses. (Tr. 374).  Bass had positive clinical findings of numbness and weakness due to polyneuropathy. (Tr. 373).  The doctor further explained that Plaintiff suffered from numbness and a needle-like feeling in his feet and

4

thighs that lasted throughout an entire day. (Tr. 374-75).  Dr. Abbati characterized this pain as moderately severe and also opined that Plaintiff suffered from moderate fatigue. (Tr. 375).  Bass was prescribed Glipizide, Lyrica, and Glyburide. (Tr. 377).

On the questionnaire, Dr. Abbati also opined as to Bass's physical limitations.  According to the doctor, Plaintiff could sit for a total of four hours and stand or walk for a total of two hours during an eight hour workday. (Tr. 375).  Bass could lift and carry up to ten pounds occasionally. (Tr. 376).  Dr. Abbati opined that Bass *was not* significantly limited in his ability to perform repetitive reaching, handling, fingering, or lifting, but then went on to find that Plaintiff *was* significantly limited in his ability to grasp, turn or twist objects, use his fingers or hands for fine manipulations, and use his arms for reaching. (Tr. 376-77).  The doctor stated that on a sustained basis, Plaintiff could not push, pull, kneel, bend, or stoop. (Tr. 379).  Dr. Abbati felt Plaintiff's symptoms were severe enough to frequently interfere with attention and concentration. (Tr. 378).  Although the doctor indicated that emotional factors did not contribute to the severity of Plaintiff's symptoms and ability to function, he found that Plaintiff was incapable of even low stress work. (*Id.*).  According to Dr. Abbati, Plaintiff would need to take unscheduled breaks of 30 minutes eight or more times during a working day, and would be absent from work two to three times a month. (Tr. 378-79).  The earliest date that the description of the symptoms and limitations in the questionnaire applied was July 11, 2012. (Tr. 379).

### 2.  Mental Impairments

Christopher Layne, Ph.D., conducted a consultative psychological examination of Bass on June 5, 2007. (Tr. 235-39).  Plaintiff reported few physical problems aside from seizures of an uncertain origin beginning when he was 35 years old. (Tr. 235).  Bass had recently told a caseworker that he experienced ankle trouble and used a cane, but Dr. Layne observed Bass

5

walked normally and did not have a cane. (*Id.*).  Bass recounted that he was a former alcoholic, and Dr. Layne wrote that Plaintiff appeared to be intoxicated at the examination. (*Id.*).  Although Bass claimed he disliked his neighbors and stopped working because he hated being around people, he lived with four friends and came to his appointment with a friend. (Tr. 235-36, 238).

Following a mental status examination, Dr. Layne opined that Bass was uncooperative and exaggerated symptoms. (Tr. 237).  According to Dr. Layne, Plaintiff showed no signs of depression, suicidal or homicidal ideas, mania, flights of ideas, anxiety, paranoia, delusions, or hallucinations. (*Id.*).  Despite low scores on intellectual testing, Dr. Layne concluded Bass's intellect was "normal" because Bass graduated from high school in regular classes, his behavior suggested intoxication, and his drinking caused him to be unmotivated during testing. (Tr. 238). Dr. Layne diagnosed alcohol dependence and concluded that Plaintiff was not impaired in his ability to relate to coworkers; understand and follow instructions; attend to and persist at simple, repetitive tasks; or withstand work stress. (Tr. 239).  The doctor found Plaintiff to be markedly impaired in his ability to handle money, because he did not have the judgment and motivation to spend money wisely due to issues with alcohol. (*Id.*).

On November 5, 2008, Plaintiff was admitted for five days of inpatient treatment at Rescue Mental Health Services ("RMHS") due to hallucinations. (Tr. 270, 273).  He presented as paranoid and withdrawn, and reported auditory hallucinations of voices telling him to do things. (Tr. 273).  He said he was constantly on-guard and feared that others were talking about him and out to get him. (*Id.*).  Bass expressed that he did not like being around people. (*Id.*).  Plaintiff's diagnoses were schizophrenia, paranoid type; major depressive disorder, recurrent, severe with psychotic features; social phobia; alcohol dependence in early full remission; and attention deficit hyperactivity disorder ("ADHD"). (Tr. 282).  His Global Assessment of Functioning

6

Score ("GAF") was 41, signifying serious symptoms. (*Id.*).  Bass was referred to the Zepf Community Mental Health Center ("Zepf Center") for further care. (Tr. 285).  Following in-patient treatment, Plaintiff continued to report auditory as well as visual hallucinations. (Tr. 270).  He felt sad and irritable, experienced insomnia, described feelings of worthlessness and hopelessness, and recounted previous thoughts of suicide. (*Id.*).  He was without a home and living at the Salvation Army. (*Id.*).

On November 24, 2008, Plaintiff began treatment with Barbara LaForrest, M.D., at the Zepf Center. (Tr. 286-87).  Bass stated that he began having auditory hallucinations around age 35, approximately nine years prior, and some of these hallucinations instructed him to harm others. (Tr. 286).  While undergoing in-patient treatment at RHMS, Plaintiff had begun taking psychotropic medication, which he felt was helpful, though he remained depressed. (*Id.*).  Dr. LaForrest performed a mental status examination and observed that Plaintiff displayed a depressed mood and tended to avoid eye contact, but was pleasant and cooperative, had non-pressured and coherent speech, was alert and oriented, and his thought process was organized and goal-directed. (Tr. 287).  Bass said he isolated himself and was suspicious of others. (*Id.*).  Dr. LaForrest diagnosed schizoaffective disorder and ruled out ADHD. (*Id.*).  The doctor assigned a GAF score of 53, representing moderate symptoms. (*Id.*).  She adjusted Plaintiff's medications, including an increase in Abilify to help combat auditory hallucinations and suspicion of others. (*Id.*).

On December 9, 2008, Plaintiff was seen by Zepf Center nursing staff. (Tr. 327).  Bass thought his medication was working. (*Id.*).  He reported voices telling him to leave his current housing situation at the Salvation Army, and being able to sleep in only 15 to 20 minute spurts.

(*Id.*).   A mental status examination revealed that he was alert and oriented, had avoidant eye contact, slowed motor ability, and a depressed mood. (Tr. 328).

Bass presented to Dr. LaForrest on September 2, 2009, and arrived at the appointment on time. (Tr. 326).  He reported auditory hallucinations, but no command hallucinations, though he felt that Invega was not helpful. (*Id.*).  Dr. LaForrest recommended switching to Seroquel, but warned that it could increase blood sugar levels. (*Id.*).  The psychologist described Plaintiff as depressed, but pleasant. Bass had non-pressured speech, which was spontaneous, articulate, and coherent.  Plaintiff's thought process was organized and goal-directed, and he displayed no overt delusional thinking. (*Id.*).

Plaintiff arrived early for his appointment with Dr. LaForrest on October 28, 2009. (Tr. 321).  Bass indicated that Seroquel allowed him to sleep better but was not helping with auditory hallucinations, so Dr. LaForrest increased the dosage. (*Id.*).   Bass felt depressed and overwhelmed at times, but denied racing thoughts and suicidal ideation.  Dr. LaForrest described Bass's mood as dysphoric, but otherwise characterized Bass as pleasant, with normal speech and thought process. (*Id.*).

Bass was seen at the Zepf Center by Keisha Wade, R.N., on November 25, 2009. (Tr. 317).  He indicated that he was compliant with his medication and experienced no side effects. (*Id.*). Nurse Wade described Plaintiff as alert, oriented, with good hygiene and eye contact, a euthymic mood, full affect, clear speech, and goal-directed thoughts. (*Id.*).  The nurse recounted Bass's reports of auditory hallucinations, disrupted sleep, and a fair appetite. (*Id.*).  No changes in Plaintiff's mental status were noted on December 23, 2009. (Tr. 316).

On February 22, 2010, Plaintiff informed Dr. LaForrest that he was still experiencing some auditory hallucinations and had not yet had much improvement. (Tr. 313).   He was

8

sleeping well, but had periodic racing thoughts. (*Id.*).  The doctor recommended Sustenna injections, pending staff approval. (*Id.*).  Dr. LaForrest recounted Plaintiff's auditory hallucinations and described his mood as dysphoric mood. (*Id.*).

In April 2010, Bass told Dr. LaForrest that he experienced depression and auditory hallucinations, although they were not getting worse and he denied having command hallucinations. (Tr. 306).  Bass reported becoming overwhelmed easily, but denied racing thoughts. (*Id.*).  He felt Seroquel was "somewhat helpful for sleep," though he would still wake up in the middle of the night. (*Id.*).  Plaintiff denied problems with medication. (*Id.*).  Dr. LaForrest described Bass's mood as depressed, but otherwise found Plaintiff's speech and thought process in-tact. (*Id.*).

Bass treated with a Zepf Center nurse on May 17, 2010. (Tr. 305). He reported that he was medication compliant and denied side effects. (*Id.*).  The nurse described Bass as alert, oriented, with good hygiene, good eye contact, a euthymic mood, full affect, clear speech, and goal-directed thoughts. (*Id.*).  Bass experienced auditory hallucinations that were not commanding in nature, disrupted sleep, and a decreased appetite. (*Id.*).

On June 16, 2010, Plaintiff treated with Zepf Center nursing staff. (Tr. 304).  He was alert, had good speech, and eye contact. (*Id.*).  Bass's mood was somewhat depressed, he was irritable, and his appetite had improved, but he was sleeping only two hours at a time. (*Id.*).

On July 14, 2010, Bass explained that medication was helpful despite still hearing voices. (Tr. 303).  He felt that Depakote reduced the severity of his mood swings, he was sleeping fairly well, and he denied racing thoughts. (*Id.*).  Plaintiff reported that he had lost 14 pounds in the past month and felt thirsty. (*Id.*).  Dr. LaForrest recommended lab work as a result. (*Id.*).  Upon mental status examination, Bass's mood was dysphoric, but he was pleasant, had normal speech,

an organized thought process, and no overt delusional thinking. (*Id.*).  Bass reported becoming easily suspicious of others and some auditory hallucinations. (*Id.*).

On September 1, 2010, Dr. LaForrest suggested Consta injections because Bass's diagnosis of schizoaffective disorder did not qualify him for Sustenna injections. (Tr. 294).  The doctor started Plaintiff on a trial of Risperdal. (*Id.*).  On September 22, 2010, Dr. LaForrest opined that Plaintiff had a dysphoric mood, but was pleasant, his speech was coherent, his thought process was organized, and he displayed no overt delusional thinking. (Tr. 291).  Bass reported auditory hallucinations, but denied any command hallucinations. (*Id.*).  Plaintiff felt that the addition of Risperdal helped with auditory hallucinations and that he was better able to cope with them. (*Id.*).  Plaintiff did not wish to begin Consta injections. (*Id.*).

On December 4, 2010, Bass said that the addition of Risperdal had been helpful, though he still had auditory hallucinations and became easily overwhelmed. (Tr. 362).  Dr. LaForrest increased the dosage of Risperdal and decreased Seroquel. (*Id.*).  The doctor expressed concern about long-term use of Seroquel because of Bass's borderline high blood sugar. (*Id.*).  She explained that Risperdal could raise blood sugar, but to a lesser degree than Seroquel. (*Id.*).

On January 26, 2011, Bass arrived at his appointment with Dr. LaForrest on time. (Tr. 361).  He reported some auditory hallucinations, but that Risperdal worked better than Seroquel. (*Id.*). Although Plaintiff experienced depression, he was sleeping fairly well, denied racing thoughts, and had a gradually improving appetite. (*Id.*). Aside from a depressed mood and auditory hallucinations, Dr. LaForrest made no additional notable mental status findings. (*Id.*).

On March 30, 2011, Bass arrived to his appointment late and reported that he had been off of medication for 10 days. (Tr. 360). Dr. LaForrest instructed Bass to let the Zepf Center know if he was out of medication, so that providers could be sure he had some called in. (*Id.*).

10

During this period of noncompliance, Bass's auditory hallucinations worsened and he had greater difficulty sleeping. (*Id.*).  Dr. LaForrest described Bass's mood as dysphoric, but otherwise noted that Bass was pleasant, had regular speech, a goal-directed thought process, and no overt delusional thinking. (*Id.*).

On May 2, 2011, Dr. LaForrest filled out a Multiple Impairment Questionnaire. (Tr. 335-42).  She opined that she saw Bass for treatment every four weeks. (Tr. 335).  She recounted that Plaintiff's diagnoses were schizoaffective disorder and alcohol dependence in full remission. (*Id.*).  She felt that Plaintiff's medications had been somewhat helpful, but he continued to experience auditory hallucinations. (*Id.*).  Though Bass had a dysphoric mood, Dr. LaForrest indicated that his speech was non-pressured, spontaneous, articulate, and coherent, and Bass said he was less suspicious of others. (*Id.*).  She described Plaintiff's primary symptoms as depression, low mood, low energy, decreased interest and concentration, auditory hallucinations, and becoming suspicious of others. (Tr. 336).  She opined that Bass would not be able to work an eight-hour day, was incapable of a low stress job, and would miss work more than three times a month. (Tr. 340-41).

That same day, Dr. LaForrest completed a narrative statement regarding Plaintiff's ability to function. (Tr. 346).  She described Plaintiff as depressed and with symptoms that seemed to worsen under stress and pressure, causing him to become more suspicious of others and have more auditory hallucinations. (*Id.*).  Dr. LaForrest felt Bass was "quite symptomatic," despite positive effects of medication. (*Id.*).  The psychologist opined that Plaintiff could not handle the stress and pressure of work activities and could not perform full time work. (*Id.*).

Plaintiff failed to attend his appointment on May 25, 2011. (Tr. 359).  On July 25, 2011, Dr. LaForrest instructed Bass to discontinue Depakote in light of increased liver function testing.

11

(Tr. 358).   In an August 15, 2011, psychiatric diagnostic updated, Dr. LaForrest assigned a current GAF score of 54, representing moderate symptoms. (Tr. 356).

On October 27, 2011, Bass complained of auditory hallucinations and mood swings.  (Tr. 355).  In response, the psychologist increased Trileptal and Risperdal. (*Id.*).  Bass's mental status examination was normal aside from a depressed mood. (*Id.*).

On December 29, 2011, Plaintiff told Dr. LaForrest that he felt "about the same," but his auditory hallucinations had somewhat improved with the increase in medication. (Tr. 354).  He reported low energy and was worried about his diabetes and elevated liver enzymes. (*Id.*).  Bass denied racing thoughts and was living with a friend. (*Id.*).

On July 5, 2012, Plaintiff treated with Duane Rodriguez-Winter, M.D., who was covering the appointment for Dr. LaForrest. (Tr. 351).   Plaintiff had been out of medication for approximately two to three months after he left the area to spend some time in North Carolina. (*Id.*).  Bass explained that the intensity of his auditory hallucinations and difficulty sleeping had increased without medication, as well as feelings of distress and depression. (*Id.*).  Bass also explained that he had previously taken medication for diabetes, but had not been consistent in doing so. (*Id.*).  Dr. Rodriguez-Winter described Bass's mood as "depressed to a mild degree," and speech as soft and well-articulated. (*Id.*).  Bass was fully oriented. (*Id.*).  The doctor felt that cognitive themes included low self-regard and struggles with persistent auditory hallucinations. (*Id.*).  The doctor restarted Bass on psychotropic medication. (*Id.*).

Bass failed to attend his appointment on July 25, 2012. (Tr. 352).  On August 30, 2012, Dr. LaForrest noted that Plaintiff had missed his morning appointment and had come instead in the afternoon. (Tr. 350).  Plaintiff experienced improvement on medication, and Dr. LaForrest

12

restarted Trileptal.  Bass explained that he was taking insulin and seeing Dr. Abbati as his family physician. (*Id.*).

On November 8, 2012, Bass reported auditory hallucinations, but that he was able to cope with them, though they became worse under stress and pressure. (Tr. 384).  He denied command hallucinations. (*Id.*).  Trazodone helped his sleep. (*Id.*).  Dr. LaForrest described Plaintiff as dysphoric but pleasant. (*Id.*).  His speech was non-pressured, articulate, and coherent, and he had an organized thought process. (*Id.*).

On November 12, 2012, Dr. LaForrest completed a Psychiatric/Psychological Impairment Questionnaire. (Tr. 365-71).  The doctor explained that Plaintiff had been on multiple psychiatric medications since 2008, with some mild improvement, but still experienced depression, mood swings, and auditory hallucinations. (Tr. 365).  She indicated that his symptoms increased when under stress. (*Id.*).  Dr. LaForrest listed the following clinical findings to support her diagnosis: sleep and mood disturbance, mood lability, auditory hallucinations, anhedonia, paranoia or inappropriate suspiciousness, feelings of worthlessness, difficulty thinking or concentrating, suicidal ideation, social withdrawal or isolation, and decreased energy. (Tr. 366).

Dr. LaForrest opined that Plaintiff was *moderately limited* in his ability to understand and remember detailed instructions, sustain ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, interact appropriately with the public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior. (Tr. 368-69).  The doctor identified *marked limitations* in Bass's ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within

13

a schedule, maintain regular attendance, and be punctual; make simple work-related decisions; complete a normal workweek without interruptions from psychologically-based symptoms; perform at a consistent pace; and respond appropriately to change in the work setting. (*Id.*).  She opined that Plaintiff was incapable of low stress work and estimated that he would be absent more than three times per month. (Tr. 370-71).

On December 19, 2012, Plaintiff stated he was medically compliant and denied side effects from medication. (Tr. 382).  The nurse practitioner described him as alert and oriented, with good eye contact and hygiene, displaying a euthymic mood and full affect, demonstrating clear and goal-directed speech, and reporting a good appetite. (*Id.*).  Plaintiff mentioned some auditory hallucinations and "ok" sleep. (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

2.  The claimant has not engaged in substantial gainful activity since August 1, 2006, the alleged onset date.

3.  The claimant has the following severe impairment: schizoaffective disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: work with an SVP of Level 1 to 2, where the pace of productivity is not dictated by an external source over which the claimant has no control, such as an assembly line or conveyor belt; occasional contact with the general public and frequent contact with coworkers; and work that is repetitive from day to day, with expected changes.

14

6. The claimant is capable of performing past relevant work as a stores laborer (DOT #922.687-056).  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2006, through the date of this decision.

(Tr. 21-33) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x. 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in

15

dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. ANALYSIS

### A.  Treating Physician Dr. LaForrest & Plaintiff's Mental RFC

Plaintiff argues that the ALJ violated the treating physician rule with respect to Dr. LaForrest, Plaintiff's psychologist.  Dr. LaForrest began treating Plaintiff in November 2008. (Tr. 365).  Thereafter, Plaintiff was scheduled for treatment with Dr. LaForrest or a nurse at the Zepf Center every four to six weeks. (*Id.*).  The psychologist completed three statements addressing Bass's functional limitations, which included a May 2011 questionnaire, a May 2011 narrative report, and a November 2012 questionnaire.  (Tr. 335-42, 346, 365-71).  In determining Plaintiff's RFC, the ALJ gave "reduced weight" to these opinions. (Tr. 30).  The parties do not dispute Dr. LaForrest's status as a treating physician.

It is well-established that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).

16

The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544.  When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6).  The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

Here, the ALJ accurately concluded that some portions of Dr. LaForrest's opinions involved findings on issues reserved to the Commissioner. (Tr. 30).  For instance, in her narrative statement, Dr. LaForrest opined that Bass could not "do full time competitive work." (Tr. 346).  It is well-established that only a treating source's *medical opinions* are entitled to deference. *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010) (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)).  Opinions on issues such as whether the claimant is employable are not medical opinions, nor deserving of any particular weight. *Id.* (*citing* 20 C.F.R. §§ 404.1527(e), 416.927(e)).  The ALJ announced this principle and confronted these parts of Dr. LaForrest's opinion accordingly. (Tr. 28, 30).  Nevertheless, the ALJ failed to provide sufficient good reasons for rejecting the remainder of the treating psychologist's findings.

The undersigned finds merit to Plaintiff's argument that the ALJ was more influenced by Plaintiff's GAF scores than she was entitled to be.  In her opinion, the ALJ explained that the Plaintiff's GAF scores improved over the course of his treatment, increasing from a GAF of 41 at the time of intake at the Zepf Center in 2008, to a GAF of 55 when Dr. LaForrest issued her functional questionnaire in late 2012. (Tr. 30).  The ALJ felt that the increase in scores reflected a "significant improvement" in Bass's symptoms. (*Id.*).  Additionally, the ALJ emphasized that the later GAF scores evidenced only moderate symptoms, which were incongruent with the limitations Dr. LaForrest assigned. (*Id.*).  The ALJ used the scores as a ground to reduce the value accorded to Dr. LaForrest's opinion. (*Id.*).

A GAF score "is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. . . . A GAF score may help an ALJ assess mental RFC, but it is not raw medical data.  Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006) (*quoting* DSM-IV-TR at 34) (internal notations omitted).  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Davis v. Comm'r of Soc. Sec. Admin.*, No. 1:13-CV-01556, 2014 WL 4182737, at *7 (N.D. Ohio Aug. 21, 2014) (*quoting* DSM-IV-TR at 34). A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

Mental health care providers previously used the GAF scale to assess a person's psychological, social, and occupational functioning and to provide a "snapshot" of an

individual's functioning at or near the time of evaluation. *Judy v. Colvin*, No. 3:13-CV-00257, 2014 WL 1599562, at *3 n.3 (S.D. Ohio Apr. 21, 2014) *report and recommendation adopted*, No. 3:13-CV-00257, 2014 WL 1900614 (S.D. Ohio May 9, 2014). However, the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") no longer includes the GAF score. *Davis v. Commissioner*, No. 1:13-CV-1556, 2014 WL 4182737, at *8 (N.D. Ohio Aug. 21, 2014). Courts have recognized that the usefulness of GAF scores is now dubious, particularly when compared to the deference generally granted to a treating source's opinions. *Judy*, 2014 WL 1599562, at *9.

In the present case, the ALJ's observation that Plaintiff's GAF scores increased gradually over the course of his mental health treatment is accurate. Even so, Plaintiff's GAF score only reached 55. Given that the GAF scale is a continuum, Plaintiff's GAF scores over the course of treatment were mostly closer to 50 ("serious symptoms") than to 61 ("mild symptoms"). As a result the GAF scores do not necessarily conflict with the marked mental work limitations Dr. LaForrest assigned. More importantly, however, the Court recognizes the questionable usefulness of GAF scores in assessing mental health.

Moreover, beyond using Bass's GAF scores as a ground to devalue the treating source's opinion, the ALJ gave these scores "significant weight" in formulating the mental RFC. (Tr. 30). The ALJ felt that the scores were not inconsistent with the ability to perform a range of unskilled work. (*Id.*). Even before the American Psychiatric Association's abandonment of GAF scores, the Sixth Circuit had advised ALJs to "significantly temper their reliance on GAF scores, given their limited utility, and to use other substantial evidence in the record as support for their functional limitation determinations." *Long v. Astrue*, No. 3:10-0273, 2011 WL 1258407, at *21 (M.D. Tenn. Mar. 7, 2011) *report and recommendation adopted*, No. 3:10-00273, 2011 WL

1258507 (M.D. Tenn. Mar. 30, 2011) (*citing Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007)).  In making the RFC determination, the ALJ accorded reduced weight to Plaintiff's treating source and granted significant weight to the GAF scores.  In fact, it appears that the ALJ granted the greatest weight to Plaintiff's GAF scores when formulating the mental RFC over all other evidence.  Such an elevation of the GAF scores as a basis for the RFC is inappropriate and made more problematic by the ALJ's failure to provide good reasons for discrediting the treating psychologist.  As a result, the ALJ's significant reliance on GAF scores to formulate the RFC was a critical flaw in the disability determination that requires remand.

The ALJ also devalued Dr. LaForrest's opinion because the psychologist's treatment records did not fully support the limitations the doctor assigned. (Tr. 30).  The ALJ explained that she came to this conclusion for two reasons:

> First, the clinical findings noted therein are relatively benign, especially at around the time the latter opinion was issued; the claimant was described as euthymic with a full affect, his other findings were generally unremarkable, he reported that his concentration was "okay," he was coping with the voices, his sleep was better with medications, and he denied having side effects.  This is completely inconsistent with the limitations expressed by Dr. Laforrest just a month earlier.

> Secondly, although the psychiatrist acknowledged the claimant's improvement with treatment and medication, as established by the treatment records, her opinion did not change significantly from May of 2011 to December of 2012, which casts some doubt on its credibility as well.

(*Id.*).

The ALJ's focus on a lack of supporting evidence fails to serve as good reason for rejecting the treating source.  First, the ALJ concludes that the clinical findings are "relatively benign," and therefore do not support the psychologist's opinions. (Tr. 30)  However, the ALJ fails to explain how the "relatively benign" findings she refers to are incongruent with the limitations Dr. LaForrest assigned.  While the ALJ gives some insight as to what she means by

20

the phrase "benign findings" by describing a treatment note from December 2012, the ALJ otherwise provides little insight as to why these findings rendered the limitations Dr. LaForrest recommended, after treating Plaintiff over the course of years, unworthy of deference. (Tr. 30, 382).  The ALJ's lack of explanation is particularly concerning given that Plaintiff experienced auditory hallucinations, sleep and mood disturbance, depression, and mood swings, which are generally reflected throughout the record and recounted in Dr. LaForrest's opinions as support for the limitations the psychologist assigned.  As a result, the ALJ's reasoning is not sufficiently specific such that it makes clear to the Court why treatment notes failed to support the treating psychologist's opinions.

Additionally, substantial evidence does not underpin the ALJ's decision to devalue Dr. LaForrest's limitations because the ALJ felt that the psychologist's "opinion did not change significantly from May 2011 to December 2012." (Tr. 30).  Essentially, the ALJ compares the opinions that Dr. LaForrest issued regarding Plaintiff's mental impairments at different times in the relevant period and concludes that the opinions do not sufficiently reflect the improvement that the ALJ believed treatment notes suggested.  As an initial matter, the ALJ incorrectly refers to Dr. LaForrest's November 2012 opinion as being authored in December 2012.  Dr. LaForrest set out her opinions as to Plaintiff's functioning in a Multiple Impairment Questionnaire and narrative statement completed in May 2011, as well as a Psychiatric Impairment Questionnaire completed in November 2012. (Tr. 335-42, 346, 365-71).  Accordingly, the ALJ is comparing the May 2011 opinions to the November 2012 opinion.  Putting aside this error, the ALJ's conclusion that Dr. LaForrest's opinions should have changed between May 2011 and November 2012 is flawed in two respects.

First, treatment records from May 2011 to November 2012 do not demonstrate a substantial shift in Plaintiff's symptoms or mental health impairments such that Dr. LaForrest's November 2012 opinion should have been significantly different from her May 2011 opinions. While Dr. LaForrest acknowledged that Bass improved with treatment, she indicated that he continued to be "quite symptomatic." (Tr. 346).   In the treating source analysis, the ALJ highlights a Zepf Center nurse's report from December 2012 where Plaintiff reported improvement, but because this record followed the issuance of the November 2012 opinion, it does not support the ALJ's conclusion that the doctor's opinion should have changed between May 2011 and November 2012.

Second, it is difficult to compare the three opinion statements Dr. LaForrest authored. The May 2011 Multiple Impairment Questionnaire generally involved questions about physical limitations, rather than mental impairments, and as a result Dr. LaForrest left many sections blank and was not able to provide much insight as to Plaintiff's work-related mental limitations. (Tr. 335-42).  The psychologist's May 2011 narrative statement described Plaintiff's symptoms, but likewise provided little detail about work-related abilities. (Tr. 346).  On the other hand, the November 2012 Psychiatric Impairment Questionnaire specifically discussed many work-related mental limitations. (Tr. 365-71).  These three reports had only a small amount of substantive overlap.  As a result, comparing them does not strongly indicate that the treating source's findings ought to have been doubted.

Plaintiff also asserts that the ALJ failed to account for the factors set forth in 20 C.F.R. §§ 416.927 and 404.1527 when evaluating Dr. LaForrest's opinion.  The text of the regulations guiding the ALJ's review of a claimant's treating source opinions requires the ALJ to "consider" the factors set forth when making his decision. 20 C.F.R. §§ 416.927, 404.1527.  A factor-by-

22

factor analysis is not required so long as the ALJ's decision clearly conveys why the opinion was credited or rejected. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011). Here, the ALJ was not required to expressly address each of the factors in her opinion to show she considered them. However, the ALJ appears to have focused on GAF scores and the lack of supporting evidence for the treating source's opinion to the exclusion of other possible regulatory factors. For instance, Dr. LaForrest was a mental health specialist, who treated Bass frequently over the course of years.

Accordingly, Plaintiff's challenges to the ALJ's rejection of Dr. LaForrest's opinions are well taken. On remand the ALJ should reassess the psychologist's opinions, while considering the factors set out in the regulations, and provide specific good reasons in support of her treating source finding. In addition, the ALJ must reconsider the mental RFC in light of the appropriate weight to be attributed to Bass's GAF scores.

**B. Dr. Abbati**

Plaintiff also takes issue with the ALJ's treatment of Dr. Abbati's opinion. On December 1, 2012, Dr. Abbati completed a Multiple Impairment Questionnaire setting out his opinions as to Plaintiff's physical limitations. (Tr. 373-80). The doctor indicated that he began treating Bass on July 11, 2012, and saw Bass every six weeks. (Tr. 373). Bass's most recent examination was on November 26, 2012. (*Id.*). As a result, it would appear that Dr. Abbati treated Plaintiff on approximately two to three occasions over the course of five months before completing the questionnaire.

The ALJ summarized Dr. Abbati's opinion and attributed "little weight" to the physician's medical opinions in the questionnaire for a number of reasons. (Tr. 28). The ALJ explained that there was little support for Dr. Abbati's opinion in the record, particularly given

that there were no treatment notes from Dr. Abbati's sessions with Plaintiff and there was little other objective evidence of Plaintiff's physical impairments. (*Id.*).  The ALJ further explained that there was no evidence showing Bass required frequent breaks or would incur frequent absences due to his physical symptoms. (*Id.*).  Because Dr. Abbati made inconsistent statements regarding Plaintiff's ability to handle objects, the ALJ discounted those limitations as well. (*Id.*).  Finally, the ALJ observed that Dr. Abbati opined the restrictions contained in the questionnaire had been present only since July 11, 2012, the date on which Dr. Abbati began providing treatment. (*Id.*).  As a result, the ALJ found that Dr. Abbati's opinion did not address Plaintiff's functional capacity during most of the period at issue in his claim for disability. (Tr. 29).

Plaintiff takes issue with treating physician analysis only on the ground that the ALJ did not make an attempt to obtain additional medical reports from Dr. Abbati before concluding that the doctor's opinion was not supported by the record.  According to Plaintiff, the ALJ failed in her duty to fully and fairly develop the evidentiary record by not obtaining these files.  Plaintiff cites to 20 C.F.R. §§ 404.1512 and 416.912, but does not identify a specific subsection to support his claim.  In relevant part, the regulations at issue state:

> (a) General. In general, *you have to prove to us* that you are blind or disabled. . . . This means that *you must furnish the medical and other evidence* that we can use to reach conclusions about your medical impairment(s) . . .
>
> (c) *Your responsibility.* You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. *You must provide evidence*, without redaction, showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your claim. . . .
>
> (d) *Our responsibility.* Before we make a determination that you are not disabled, we will develop your complete medical history for at least 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. *We will*

24

> *make every reasonable effort to help you get medical reports from your own*
> *medical sources when you give us permission to request the reports.*

20 C.F.R. §§ 404.1512, 416.912 (emphasis added).

During the administrative hearing, the issue of procuring records from Dr. Abbati was specifically discussed. (Tr. 424).  Plaintiff's attorney submitted Dr. Abbati's questionnaire to the ALJ and indicated that the doctor had not been responsive to requests for supporting medical documents. (*Id.*).  The ALJ advised counsel that the opinions in Dr. Abbati's questionnaire would be of little value without supportive records from the physician. (Tr. 425).  The ALJ granted Plaintiff an additional two weeks to obtain and submit medical records from Dr. Abbati. (*Id.*).  Nevertheless, it appears that Plaintiff did not obtain and submit these records to the ALJ.

The Sixth Circuit has found that an ALJ may make a reasonable effort to obtain records by granting a claimant's counsel extra time to secure the records. *Robertson v. Comm'r of Soc. Sec.*, 513 F. App'x 439, 441 (6th Cir. 2013).  Additionally, the regulations Plaintiff bases his argument on emphasize that it is the claimant's burden to produce evidence in support of his disability claim. *See Smith v. Soc. Sec. Admin.*, No. 3:10-0145, 2011 WL 795006, at *5-7 (M.D. Tenn. Mar. 1, 2011) ("It is not the rule in the Sixth Circuit, nor in the framework of 20 C.F.R. § 404.1512, that the SSA or its ALJs are expected to build the medical record from a claimant's bare claim form and identification of medical sources.").  "Only under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures, does an ALJ have a special, heightened duty to develop the record." *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (*citing Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)).

Bass was represented by counsel and the ALJ granted him an opportunity to supplement the record with the medical evidence at issue.  Plaintiff did not produce this evidence, and under these circumstances, the Court cannot conclude that the ALJ violated her duty to develop the record.  As a result, the ALJ did not error in discrediting Dr. Abbati's opinion due to a lack of treatment notes supporting the limitations recommended.  Furthermore, the ALJ provided a number of additional good reasons, which Plaintiff does not now challenge, for granting less than controlling weight to Dr. Abbati's opinion such that the treating source analysis is substantially supported.

### C.  Social Security Ruling 96-8p

Plaintiff also maintains that the ALJ's residual functional capacity ("RFC") determination as to his mental abilities was flawed because the ALJ failed to cite to specific medical facts or nonmedical evidence in support of the limitations adopted.  According to Plaintiff, the ALJ's formulation of the mental portion of RFC violated the method of analysis required by Social Security Ruling ("SSR") 96-8p, which provides

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

1996 WL 374184, at *2 (July 2, 1996).

Contrary to Plaintiff's allegation, the ruling does not require the ALJ to explain how specific evidence in the record supported each functional limitation in the RFC.  The ultimate

responsibility for assessing the evidence and formulating the RFC is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In this case, the ALJ provided a sufficient narrative discussion describing how she arrived at the RFC in accordance with SSR 96-8p, though the ultimate RFC determination may be flawed for the reasons described above regarding the treating source analysis and GAF scores. The ALJ addressed all of the medical opinion evidence, accounted for Bass's testimony at the hearing regarding his symptoms and limitations, examined Bass's daily activities, and discussed medical evidence related to Bass's course of treatment. The Court is uncertain what additional level of detail the ALJ could have included in her assessment of Plaintiff's mental RFC. The ALJ explained how she determined Plaintiff's RFC beyond a conclusory statement that the RFC was based on "the medical evidence of record, the credible medical opinions, the claimant's activities, and the other factors described above." (Tr. 31). The ALJ could have, perhaps, expressly discussed Plaintiff's ability to sustain work in an ordinary day, but the failure is not one that would necessitate remand. Given that remand is otherwise necessary, the ALJ may keep in mind Plaintiff's ability to sustain work upon reconsideration.

### D. Plaintiff's Credibility

Bass also alleges that the ALJ failed to properly evaluate his credibility. Generally, "[a]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or

27

intuitive notion about an individual's credibility.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (*quoting* S.S.R. 96-7p, 1996 WL 374186, at *4).

The Sixth Circuit follows a two-step process in the evaluation of a claimant's subjective complaints of disabling pain. 20 C.F.R. §§ 404.1529, 416.929; *Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work. *Id.*  The ALJ should consider the following factors in evaluating the claimant's symptoms:  the claimant's daily activities; the location, duration, frequency and intensity of the claimant's symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve the pain; measures used by the claimant to relieve the symptoms; and statements from the claimant and the claimant's treating and examining physicians. *Id.*; *see Felisky*, 35 F.3d at 1039-40; S.S.R. 96-7p, 1996 WL 374186 (July 2, 1996).

Taking into account Bass's testimony, the record evidence, and applicable factors for evaluating credibility, the ALJ concluded that Bass's medically determinable impairments could cause his alleged symptoms, but that his statements as to the intensity and limiting effects of his symptoms were not entirely credible. (Tr. 26, 27).  While some flaws exist as to the ALJ's analysis, as will be discussed further herein, the ALJ nevertheless provided sufficient good reason to support the adverse credibility determination.

Starting with Plaintiff's statements regarding his disabling physical symptoms, the ALJ provided sufficient grounds to call into question Plaintiff's credibility.  The ALJ observed that Bass had undergone minimal treatment for his physical impairments over the course of the relevant period, which contradicted Bass's allegations of physical disability, including Bass's statement that he had considered using a walker. (Tr. 27, 204).  Plaintiff asserts that the ALJ should not have drawn this conclusion without trying to obtain records relevant to his physical health, but as previously discussed, the ALJ did not err in her duty to develop the record.  As a result, the ALJ properly found the lack of treatment for physical impairments over the relevant period undermined Plaintiff's allegations of disabling physical symptoms and limitations.

The ALJ also explained that Plaintiff engaged in daily activities which undermined his claims of disability. (Tr. 27).  The ALJ explained that she detailed these activities in her discussion of whether Plaintiff met or medically equaled a listing level impairment and also recounted some of these activities again in the credibility portion of her opinion. (Tr. 27, 24).  More specifically, the ALJ indicated that Plaintiff could prepare simple meals, take public transportation, and shop for clothing at the Salvation Army. (Tr. 24, 199, 200).  The ALJ also highlighted Plaintiff's testimony that he cared for his personal needs and took on odd jobs, such helping to rotate the tires on a car. (Tr. 26, 439, 440).  These activities call into question Plaintiff's allegations of disabling physical limitations, particularly in light of the lack of medical treatment for physical impairments.

While Plaintiff contests the ALJ's use of daily activities, the regulations advise the ALJ to consider an individual's daily activities when evaluating a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).  The ALJ here does not appear to have mischaracterized Plaintiff's description of his daily activities. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234,

248-49 (6th Cir. 2007) (ALJ's use of claimant's daily activities to question her credibility was inappropriate because the ALJ mischaracterized the plaintiff's testimony regarding the scope of her daily activities, failed to examine the physical effects co-extensive with the performance activities, and failed to comment on the fact that the plaintiff received assistance for many activities and personal care from her children).  Given that the ALJ also considered other reasons for questioning Plaintiff's credibility, it does not seem that the ALJ put undue weight on daily activities when making the credibility determination.  Taken together, the lack of treatment and daily activities substantially support the ALJ's conclusion that Plaintiff's statements regarding the extent of his physical symptoms and limitations were not entirely credible.

As to Plaintiff's statements regarding his mental impairments, the ALJ highlighted Plaintiff's noncompliance with mental health treatment.  Bass maintains that the ALJ violated Social Security Ruling 96-7p when weighing his noncompliance against him.  The ruling explains that a plaintiff's statements may be less credible

> [I]f the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96-7P, 1996 WL 374186, at *7 (July 2, 1996).  Plaintiff goes on to cite *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989), arguing that noncompliance with treatment is frequently a symptom of mental disability, and therefore cannot be used against him.  In *Blankenship*, the court warned that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation," and concluded that failure to seek formal mental health treatment "should not be a determinative factor in a credibility assessment." *Id.*

In some circumstances a failure to seek treatment "may say little about a claimant's truthfulness." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004).  However, there should be some evidence to suggest that the individual's mental condition somehow hindered him from seeking treatment. *Id.*  In other words, an ALJ should consider whether a claimant's failure to obtain treatment is another symptom of his impairment, but the record must contain evidence supporting such a finding.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-284 (6th Cir. 2009).  Here, Plaintiff does not point to evidence that shows his mental condition prevented him from consistently taking his medication and attending appointments.  The record indicates that Bass was noncompliant due to running out of medication or because he was out of town. (Tr. 351, 360).  The ALJ's opinion does not suggest that noncompliance was a "determinative factor" in the credibility analysis.  Accordingly, the ALJ appropriately considered Plaintiff's noncompliance as a reason to question his credibility.

Next, the ALJ questioned Bass's credibility because mental health treatment records contained relatively benign observations and show that Bass's symptoms improved significantly with treatment and medication. (Tr. 27-28).  The ALJ did not explanation how the benign observations and Bass's improvement undermine the allege severity of his mental health symptoms. Additionally, while the ALJ notes significant improvement with treatment and medication, the ALJ goes on to recount that Plaintiff, too, acknowledged his hallucinations improved with medication. (Tr. 28).  As a result, further analysis, which may be provided on remand, is required to conclude that these factors weigh against Bass's credibility.

The ALJ also pointed out that Plaintiff denied having side effects from medications during a December 19, 2012, treatment session, which was inconsistent with Plaintiff's hearing testimony that he experienced side effects of dry mouth and dizziness. (Tr. 28, 435).  The record

reflects that at certain Zepf Center treatment sessions, Plaintiff indicated he did not experience side effects from medication. (*See, e.g.*, tr. 305-06).  Nevertheless, other mental health treatment records indicate that Plaintiff did complain of side effects.  Contrary to the ALJ's conclusion, on at least one occasion, Plaintiff mentioned that he felt thirsty, and experienced other side effects like weight loss. (Tr. 303).  Additionally, Plaintiff cites to records that indicate his medications caused drowsiness (Tr. 293, 346) and increased liver enzymes. (Tr. 358).  Given that the record demonstrates side effects from psychotropic medications, the ALJ's reliance on one treatment note where Plaintiff denied side effects to contradict Plaintiff's testimony fails to support the credibility determination.

Finally, the ALJ found that Plaintiff's functioning at the hearing undermined his allegations of disabling mental impairments.  The ALJ observed that Bass was able to maintain sufficient attention and concentration, and he expressed himself well, despite his allegations to the contrary. (Tr. 28, 434).

Bass argues that the ALJ improperly placed heavy weight on his presentation.  However, it is well-established that "[a]n ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, *the ALJ's personal observations*, and the objective medical evidence contradict each other." *Williams v. Comm'r of Soc. Sec.*, 93 F. App'x 34, 2004 WL 445184, at *2 (6th Cir. Mar. 9, 2004) (*quoting Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990)) (emphasis added).  The ALJ's reliance on personal observations made at the administrative hearing is not inappropriate as long as the credibility determination does not rest primarily on personal observations. *See, e.g., Johnson v. Comm'r of Soc. Sec.*, 2000 WL 332059 at *4 (6th Cir. 2000) (the court disapproved of the "sit and squirm" test, but found no error where the ALJ "provided a detailed analysis of Plaintiff's pain, assessing medical records, pain

treatments, and daily activities . . . [and his] personal observation was one of several factors, not the sole factor, in determining that Plaintiff's pain was not disabling"); *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 538 (6th Cir. 1981) (because credibility "is crucial to resolution of the claim, the ALJ's opportunity to observe the demeanor of the claimant is invaluable, and should not be discarded lightly").

In the present case, the ALJ drew reasonable conclusions from Bass's functioning at the hearing and did not base the credibility determination solely upon her personal observations of Bass.  When taken together with Plaintiff's lack of compliance, the ALJ's observations of Plaintiff at the hearing serve as sufficient reason to question Plaintiff's statements regarding the extent of his mental impairments, particularly given the deference awarded to ALJs' credibility determinations.  Nonetheless, because remand is appropriate for the ALJ to address the treating source analysis and GAF scores, the ALJ will have the opportunity to remedy any flaws that might exist with regard to credibility.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be REVERSED and REMANDED.

s/ Kenneth S. McHargh      
Kenneth S. McHargh
United States Magistrate Judge

Date:  February 6, 2015.


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).